ACCEPTED
03-15-00144-CR
7731854
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/6/2015 6:15:01 PM
JEFFREY D. KYLE
CLERK

**CAUSE NO. 03-15-00144-CR (Count 1)**

**IN THE COURT OF APPEALS FOR THE THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/6/2015 6:15:01 PM
JEFFREY D. KYLE
Clerk

**CHRISTOPHER ARTHUR KURTZ**
**Appellant**

**VS.**

**THE STATE OF TEXAS**
**Appellee**

**FROM THE CAUSE NUMBER CR2014-343
IN THE 207TH JUDICIAL DISTRICT COURT OF
COMAL COUNTY, TEXAS
HONORABLE JACK ROBISON, JUDGE PRESIDING**

**APPELLEE'S (STATE'S) BRIEF**

**ATTORNEY FOR THE STATE:**

**CLAYTEN HEARRELL
ASSISTANT CRIMINAL DISTRICT ATTORNEY
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. SEGUIN AVENUE, SUITE 307
NEW BRAUNFELS, TEXAS 78130
(830) 221-1300
(830) 608-2008 FAX
hearrc@co.comal.tx.us
SBN: 24059919**

**ORAL ARGUMENT IS REQUESTED**

CAUSE NO. 03-15-00144-CR (Count 1)

IN THE COURT OF APPEALS FOR THE
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN, TEXAS

---

CHRISTOPHER ARTHUR KURTZ
Appellant

VS.

THE STATE OF TEXAS
Appellee

---

FROM THE CAUSE NUMBER CR2014-343
IN THE 207TH JUDICIAL DISTRICT COURT OF
COMAL COUNTY, TEXAS
HONORABLE JACK ROBISON, JUDGE PRESIDING

---

**APPELLEE'S (STATE'S) BRIEF**

---

To The Court of Appeals:

Comes now The State of Texas, hereinafter referred to as the State, in response to Appellant's brief and requests this court to overrule Appellant's points of error and affirm the judgment of the trial court. In support thereof, the State would show the Court the following:

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Table of Contents | i-ii |
| Identity of Parties and Counsel | iii |
| Index of Authorities | iv-vi |
| Statement of the Case | 1-3 |
| Statement of Facts | 3-9 |
| State's Response to Appellant's Point of Error | 9-33 |
| Summary of the Argument | 9-10 |
| Legal Sufficiency Standard of Review | 10-13 |
| Evidence Relevant to Legal Sufficiency | 13-20 |
| State's Exhibit 1 – In-Car Video of Officer Kempker | 13-16 |
| The Testimony of Alicia Sanchez | 16-17 |
| State's Exhibit 7 – Video Taped Statement of Alicia Sanchez | 18-19 |
| State's Exhibit 8 – Video Taped Statement of Appellant | 19 |
| State's Exhibits 9 and 10 – Recorded Jail Visits | 19-20 |
| Testimony of Appellant | 20 |
| Argument and Authority | 21-33 |
| Elements of Aggravated Kidnapping | 21 |
| Intent to Commit Kidnapping | 21-23 |
| Restraint | 23-28 |
| Abduction | 28-32 |
| Deadly Weapon and Other Elements | 32-33 |

Conclusion                                        33

Prayer                                            33

Certificate of Service                            34

Certificate of Compliance                         35

# IDENTITY OF PARTIES AND COUNSEL

Appellant – Christopher Arthur Kurtz

Appellee – The State of Texas

**Attorneys for the Appellant**

Matt Stolhandske and Venessa Rodriguez
1004 S. St. Mary's
San Antonio, TX 78205
*For the Appellant at Trial*

John G. Jasuta and David A. Schulman
1801 East 51st St., Ste 365-474
Austin, TX 78723
*For the Appellant on Appeal*

**Attorneys for the Appellee**

Clayten Hearrell and Chari Kelly
Assistant Criminal District Attorneys
Comal County Criminal District Attorney's Office
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
*Attorneys for the State at Trial*

Clayten Hearrell
Assistant Criminal District Attorney
Comal County Criminal District Attorney's Office
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
*Attorney for the State on Appeal*

# INDEX OF AUTHORITIES

**CASE**                                                                        **PAGE**

*Brimage v. State*, 918 S.W.2d 466, 475-76 (Tex. Crim. App. 1996)    28

*Brown v. State*, 649 S.W.2d 160, 163
(Tex. App.—Austin 1983, no pet.)    13

*Charles v. State*. 05-10-01520-CR, 2012 WL 2335323
(Tex. App.—Dallas June 20, 2012, pet. ref'd)
(not designated for publication)    31-32

*Cortez v. State*, 08-02-00363-CR, 2004 WL 178587, at *3
(Tex. App.—El Paso Jan. 29, 2004, pet. ref'd)    11

*Ervin v. State, 331 S.W.3d 49, 54
(Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)*    10

*Gaffney v. State.* 937 S.W.2d 540, 542
(Tex.App.-Texarkana, 1996, no pet.)    26

*Gonzales v. State*, 190 S.W.3d 125, 132
(Tex.App.-Houston [1st Dist.] 2005, pet. ref'd)    22, 27

*Goodman v. State*, 66 S.W.3d 283, 286 (Tex. Crim. App. 2001)    11

*Hines v. State*, 75 S.W.3d 444, 447 (Tex. Crim. App. 2002)    21-23

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)    11

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)    11-12

*Kiffe v. State*, 361 S.W.3d 104, 107
(Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)    10-12

*Lane v. State*, 174 S.W.3d 376, 386
(Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)    11

*Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009)    12

*Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)    12

*Mayer v. State.* 274 S.W.3d 898, 900
(Tex.App.-Amarillo 2008, pet. ref'd)    22-23,29-30

*Megas v. State,* 68 S.W.3d 234, 240
(Tex.App.-Houston [1st District] 2002, pet. ref''d)    28-29

*Roberson v. State*, 16 S.W.3d 156, 164
(Tex. App.—Austin 2000, pet. ref'd)    12

*Rockwell v. State*, AP-76,737, 2013 WL 6529575, at *1
(Tex. Crim. App. Dec. 11, 2013)    11

*Rodriguez v. State.* 730 S.W.2d 75, 79
(Tex.App.-Corpus Christi, 1987, no pet.)    24-25

*Santellan v. State*, 939 S.W.2d 155, 162 (Tex.Crim.App. 1997)    22

| **STATUTE** | **PAGE** |
|---|---|
| Tex. Pen. Code Ann. §12.42(d) | 1 |
| Tex. Pen. Code. Ann. §20.01(1) | 21, 23, 26 |
| Tex. Pen. Code. Ann. §20.01(2) | 21 |
| Tex. Pen. Code Ann. §20.04(b) | 21 |

# STATEMENT OF THE CASE

On July 2, 2014, in Cause Number CR2014-343 in the 207th Judicial District Court of Comal County, Texas, the Grand Jury returned a four-count indictment against Appellant, Christopher Arthur Kurtz, for the felony offenses of Aggravated Kidnapping, Evading Arrest or Detention with a Vehicle, Tampering with Physical Evidence, and Tampering with Physical Evidence (I C.R. at 5-7). The second count of the indictment alleged that a deadly weapon was used during the course of Evading Arrest or Detention with a Vehicle (*id.*).

In addition to the four criminal counts, the indictment also contained two enhancement paragraphs (*id.*). The first enhancement paragraph alleged that Appellant had been convicted in 1977 in the State of Michigan for the felony offense of Possession of Phencyclidine (*id.*). The second enhancement paragraph alleged that Appellant had been convicted in 1995 in the State of Michigan for the felony offense of Carrying a Concealed Weapon (*id.*). As set out in the enhancement paragraphs, Appellant was a habitual felon subject to a range of punishment from 25 years to 99 years or life in prison. Tex. Pen. Code §12.42(d).

On October 29, 2014, the jury found Appellant guilty of the felony offenses of Aggravated Kidnapping, Evading Arrest or Detention with a Vehicle, and Tampering with Physical Evidence (I C.R. at 36-38). On that same day, the jury

1

found Appellant not guilty of Tampering with Physical Evidence as alleged in Count Four of the indictment (*id.* at 39).

Prior to trial, Appellant had elected for the jury to assess his punishment in the event he was convicted (*id.* at 21). On the morning of October 30, 2014, after having been found guilty of Aggravated Kidnapping, Evading Arrest or Detention with a Vehicle, and Tampering with Physical Evidence, Appellant failed to appear for the punishment phase of the trial (V R.R. at 6). Appellant's bond was forfeit, a warrant was issued for Appellant's arrest, and the proceedings on punishment continued in his absence (*id.* at 6-8). After hearing evidence and arguments of counsel on punishment, the jury found each enhancement paragraph to be true and assessed Appellant's punishment as confinement in the Institutional Division of the Texas Department of Criminal Justice for 70 years on Count One, 75years on County Two, and 30 years on Count Three (I C.R. at 56-65). The jury also found "True" as to the allegation that a deadly weapon had been used during the commission of the offense of Evading Arrest or Detention with a Vehicle (*id.* at 66-67). The court received the verdict and discharged the jury but did not impose sentence until Appellant was returned to court on November 20, 2014 (VII R.R. at 1-9).

On December 19, 2014 Appellant filed a Motion for New Trial and on February 17, 2015 Appellant filed Notice of Appeal (I C.R. at 111-113 and 116).

Appellant now asks the Court to vacate Appellant's conviction for aggravated kidnapping and order an acquittal for the offense of aggravated kidnapping (Appellant's Brief at 14).

## STATEMENT OF FACTS

On the morning of October 1, 2013, Sergeant James Bell of the New Braunfels Police Department was conducting a surveillance operation in hopes of locating Christopher Arthur Kurtz, Appellant, regarding an open arrest warrant (III R.R. at 106). That same morning, Alicia Dawn Sanchez was to begin a new job at Casa Garcia in New Braunfels, Texas (*id.* at 73). Shortly before Ms. Sanchez's 10:00 am shift, Appellant picked her up at her residence on a motorcycle (*id.* at 73-74). Sergeant Bell observed Appellant pull up to a residence near his location and watched as a white female came out and got onto the back of the Appellant's motorcycle (*id.* at 107). Sergeant Bell followed Appellant out of the neighborhood and onto Loop 46 but did not attempt to initiate a traffic stop because he was travelling in an unmarked vehicle (*id.* at 107-108). While following Appellant's motorcycle, Sergeant Bell radioed for marked patrol units to assist in conducting the traffic stop (*id.* at 108). Officer Kempker responded in a marked Chevy Tahoe equipped with lights and siren (*id.* at 14). When Officer Kempker arrived, Sergeant

3

Bell gave Officer Kempker the lead so that Officer Kempker could initiate the traffic stop (*id.* at 108).

As Officer Kempker approached, he activated his lights and pulled around traffic to maneuver himself behind Appellant's motorcycle (*id.*). Once behind Appellant, Officer Kempker activated his siren (*id.* at 16-17). Ms. Sanchez told Appellant that there was an officer behind them and asked Appellant to pull over at an upcoming gas station (*id.* at 75). Appellant agreed to pull over and actually began to pull over, however, as Appellant started to pull over, Ms. Sanchez heard Appellant say "Fuck it. I'm running." (*id.* at 75). Appellant then pulled back into the main lane of traffic and accelerated at a high rate of speed (*id.* at 17).

Officer Kempker followed Appellant, with lights and siren activated, as Appellant drove around Loop 46 and through an intersection at North Walnut (*id.* at 17-18). Appellant passed Casa Garcia, pulled back on to Loop 46, exited onto Interstate 35, and continued at speeds reaching115 miles per hour (*id.* at 17-18, 21, and 76). Ms. Sanchez asked Appellant to stop and asked Appellant to let her off (*id.* at 76-77). Eventually, the pursuit was called off by the active duty supervisor (*id.* at 21). Appellant never stopped for the police officers attempting to pull him over (*id.* at 77). After law enforcement had called off their pursuit, Appellant continued to the Caterpillar store in Schertz (*id.*) There he slowed down enough that Ms. Sanchez was able to hop off of the back of the motorcycle (*id.*). Once she

4

was off of the motorcycle, Ms. Sanchez ran and hid behind a piece of machinery and then ran into the bathroom of the Caterpillar store where she was found by a clerk (*id.* at 77 and 85-86).

After the chase had been called off, the Schertz Police Department located Appellant's motorcycle and informed the New Braunfels Police Department (*id.* at 27). Officer Kempker verified that the motorcycle found by Schertz was the same vehicle that Appellant was driving, and Officer Kempker joined other officers in setting up a perimeter in Schertz (*id.*). The San Antonio Police Department dispatched a helicopter to assist in locating Appellant and both the New Braunfels Police Department SWAT team and the United State's Marshall's task force arrived to assist in the search for Appellant (*id.* at 27-28). One of the officers in that perimeter was Officer Michael Rapier of the Schertz Police Department (*id.* at 61).

While positioned at the southwest corner of Schertz Fire Station Number 2, Officer Rapier observed movement in the brush line (*id.*). Officer Rapier radioed for assistance and waited until Captain Mike Penshorn of the New Braunfels Police Department arrived to assist (*id.* at 62). Officer Rapier then approached the site where he had seen movement and observed Appellant crouching under a downed tree (*id.*). Appellant failed to respond to commands from Officer Rapier to come out, so Officer Rapier pulled Appellant out from the bushes by his feet and secured Appellant in handcuffs (*id.*). At the site where Appellant had been extracted from

5

the bushes, Officer Rapier discovered a pair of keys sitting directly on top of a handgun, both hidden under the bush (*id.* at 63). Officer Rapier then released custody of the Appellant to Officer Chad Adams of the New Braunfels Police Department (*id.* at 64). Officer Rapier also released the keys and handgun to Officer Adams (*id.*). Officer Adams transported the Appellant to New Braunfels Police Department to be interviewed and submitted the keys and handgun into evidence (*id.* at 47-48). Back at the New Braunfels Police Department, Ms. Sanchez was interviewed by Detective Jace Hobbs and Appellant was interviewed by Sergeant Bell (*id.* at 97, 112).

Throughout her interview with Detective Hobbs, Ms. Sanchez was trembling, shaking, and crying (VIII R.R. State's Ex. 7). During that interview, she told Detective Hobbs:

- that Appellant was giving her a ride to work (8:30),
- that she had told Appellant there was a policeman behind them (9:18),
- that Appellant agreed to pull over at the upcoming gas station (9:18),
- that Appellant began to slow down and pull over (9:50),
- that Appellant said "Fuck it. I'm running" (9:50),
- that she told Appellant she was scared (10:24),
- that she told Appellant to stop (10:24),
- that she told Appellant she wanted off of the motorcycle (10:24),
- that Appellant drove into oncoming traffic and passed vehicles on the shoulder (11:38),
- that she thought they were going to have an accident and that they would have died in an accident (28:45),
- that she pleaded with Appellant to let her off of the motorcycle (11:38), and

6

- that when Appellant slowed down in front of the Caterpillar store, she jumped off and ran inside because she was scared and just wanted to go home (12:42).

(VIII R.R. State's Ex. 7). During Appellant's interview with Detective Bell, Appellant stated:

- that he had picked the girl up to give her a ride to work (1:38),
- that as he was driving, he looked behind him and saw an SUV with its lights on (1:50),
- that he just took off because he was going to jail anyway (3:02),
- that he knew the police were looking for him (6:30),
- that he wasn't going to jail nice and calm and he intended to make them work for their money (7:12), and
- that the girl wanted to risk her own life (7:44).

(VIII R.R. State's Ex. 8). Because Appellant had an active Family Violence Protective Order in place forbidding him from possessing a firearm, he was charged with the misdemeanor offense of Violation of a Protective Order (VIII R.R. State's Ex. 11 and VIII R.R. State's Ex. 12). Prior to trial, Appellant pled "No Contest" and was convicted of Violation of a Protective Order for possessing a firearm in violation of a Family Violence Protective Order on October 1, 2013 (VIII R.R. State's Ex. 11). Appellant was also charged with, pled no contest to, and was convicted of the offense Unlawful Carrying of a Weapon for this same criminal episode (VIII R.R. State's Ex. 12).

While Appellant was incarcerated and awaiting trial, friends visited him in the Comal County Jail on November 5, 2013 and November 26, 2013 (VIII R.R.

7

State's Ex. 9 and VIII R.R. State's Ex. 10).  During his conversation with the visitors on November 5, 2013, Appellant stated:

- I got away. (0:23),
- I was doing a hundred. (0:25),
- I was going a hundred and twenty on that fucker. (0:38),
- It wasn't locked (the motorcycle).  I couldn't lock it.  I had to get out of there real quick. I parked it and took off running.  (1:02),
- I fuckin dived over the fence and I was in the creek. (1:28),
- It took them an hour and an hour and forty five minutes to get me out of the woods. (1:34),
- They had a helicopter with a heat seeker.  That's the only way they found me. (1:38),
- Fuckin Dawn got a way. (2:05),
- The running was a felony. (2:15), and
- That's a misdemeanor, an unlicensed gun, that's a misdemeanor, that's all. (2:25)

(VIII R.R. State's Ex. 9, File One). Later, during that same jail visit, Appellant also stated:

- Didn't Dawn tell you what happened? (:02), and
- She (Dawn) was scared man.  She was beating me in the ribs, wanting off. She was screaming. Stop. Help. I said I ain't stopping till I lose these motherfuckers.  (0:07)

(VIII R.R. State's Ex. 9, File Two). During the jail visit on November 26, 2013, Appellant stated:

- No that's the just a misdemeanor (unlawful carrying). (0:06), and
- I shoved it (handgun) under a bush.  It took them two hours to find me.  I was in the woods man.  I was walking in the creek (0:12)

8

(VIII R.R. State's Ex. 10). Later in that same conversation, the visitor says "They said when they picked you up you had a gun" (*id*. at 0:32). Appellant replies to this statement, saying "Ya, I did, but you know, they had me surrounded, and I had one (a gun) and I fuckin shoved it way up under the bush, but they found it anyway." (*id*. at 0:34).

# STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR

## Summary of the Argument

In his only point of error, Appellant argues that the evidence produced at trial was insufficient to prove the offense of aggravated kidnapping (Appellant's Brief at 7). Appellant further asserts that there was no evidence produced at trial to establish that an abduction occurred and argues that the trial testimony of Alicia Dawn Sanchez, the individual abducted, clearly establishes that Ms. Sanchez was not abducted by Appellant (*id.*). In advancing this argument, Appellant fails to account for or even mention the great weight of evidence produced at trial contrary to Appellant's position, which serves to establish that an abduction occurred. Those pieces of evidence admitted at trial contrary to Appellant's position on appeal included 1) the in-car video of Officer Kempker entered into evidence as State's Exhibit 1, 2) portions of Ms. Sanchez's testimony that contradict the

9

Appellant's position, 3) the videotaped statement of Ms. Sanchez from the offense date that was entered into evidence as State's Exhibit 7, 4) the videotaped statement of Appellant from the offense date that was entered into evidence as State's Exhibit 8, 5) the recorded jail visits entered into evidence as State's Exhibits 9 and 10, and 6) the trial testimony of Appellant. Appellant's argument fails, because when all of the evidence is viewed in the light most favorable to the verdict, the evidence clearly indicates that a rational jury could have found the essential elements of aggravated kidnapping beyond a reasonable doubt

## Legal Sufficiency Standard of Review

After the decision of the Court of Criminal Appeals in *Brooks v. State*, Texas appellate courts review legal and factual sufficiency challenges in criminal cases using the same legal sufficiency standard of review. *Kiffe v. State*, 361 S.W.3d 104, 107 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Ervin v. State,* 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)). Evidence is only insufficient if, when considering all the evidence in the light most favorable to the verdict, "no rational factfinder could have found each essential element of the

charged offense beyond a reasonable doubt." *Id.*[1] (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Courts will treat direct and circumstantial evidence equally. *Kiffe*, 361 S.W.3d at 108. "[D]irect evidence of a fact, standing alone and if believed by the jury, is always… sufficient to prove that fact." *Cortez v. State*, 08-02-00363-CR, 2004 WL 178587, at *3 (Tex. App.—El Paso Jan. 29, 2004, pet. ref'd) (citing *Goodman v. State*, 66 S.W.3d 283, 286 (Tex. Crim. App. 2001)); *see also Lane v. State*, 174 S.W.3d 376, 386 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (testimony of a child victim, standing alone, is sufficient to support aggravated sexual assault conviction). Furthermore, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."*Rockwell v. State*, AP-76,737, 2013 WL 6529575, at *1 (Tex. Crim. App. Dec. 11, 2013) (not designated for publication) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)), *cert. denied,* 134 S. Ct. 2724 (2014).

Legal sufficiency review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw

---

[1] When viewing the evidence in the light most favorable to the verdict, evidence can be insufficient in two circumstances: when the record contains "no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" **or** when "the evidence conclusively establishes a reasonable doubt." *Id*. The evidence may also be insufficient when the acts alleged do not constitute the offense charged. *Id*. at 108.

11

reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Each fact in isolation need not establish the guilt of the accused. *Roberson v. State*, 16 S.W.3d 156, 164 (Tex. App.—Austin 2000, pet. ref'd). Reviewing courts will determine whether the necessary inferences are reasonable based on the "combined and cumulative force of the evidence when viewed in the light most favorable to the verdict." *Kiffe*, 361 S.W.3d at 108. Appellate courts will presume that the factfinder "resolved any conflicting inferences in favor of the verdict" and defer to that resolution. *Id*. The reviewing courts will also defer to "the factfinder's evaluation of the credibility and the weight of the evidence." *Id*. The factfinder is entitled to accept some testimony and reject other testimony, in whole or in part. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), abrogated on other grounds by *Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009); *see also Roberson*, 16 S.W.3d at 164 (factfinder may accept or reject any or all evidence presented by either party).

Ultimately, the reviewing court is not to determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). Accordingly, "the verdict will be sustained if there is any evidence which, if

12

believed, shows the guilt of the accused." *Brown v. State*, 649 S.W.2d 160, 163 (Tex. App.—Austin 1983, no pet.).

**Evidence Relevant to Legal Sufficiency**

Legal sufficiency claims survive or fail based on the evidence presented at trial. The evidence presented at trial relevant to supporting the jury's verdict and establishing legal sufficiency includes 1) the in-car video of Officer Kempker entered into evidence as State's Exhibit 1, 2) portions of Ms. Sanchez's testimony that contradict Appellant's position, 3) the videotaped statement of Ms. Sanchez from the offense date that was entered into evidence as State's Exhibit 7, 4) the videotaped statement of Appellant from the offense date that was entered into evidence as State's Exhibit 8, 5) the recorded jail visits entered into evidence as State's Exhibits 9 and 10, and 6) the trial testimony of Appellant.

## State's Exhibit 1 – In-Car Video of Officer Kempker

Officer Kempker's in-car video was introduced into evidence as State's Exhibit 1 (VIII R.R. State's Ex. 1). On October 1, 2013, Officer Kempker responded in a marked Chevy Tahoe equipped with lights and siren initiate a traffic stop on Appellant (III R.R. at 14-17). In this video, Appellant and Ms. Sanchez are both clearly visible (VIII R.R. State's Ex. 1). The video also shows the motorcycle

slowing and pulling onto the shoulder before pulling back into the main lane of traffic and accelerating (*id.* at 2:04-2:09).

Officer Kempker followed Appellant, with lights and siren activated, as Appellant drove around Loop 46 and through an intersection at North Walnut (III R.R. at 17-18). As Appellant reaches the Walnut intersection, the video introduced as State's Exhibit 1 shows heavy traffic on Loop 46 with cars pulled off on both sides of the road, depicts Appellant driving down the center of the road using the center turn lane to pass other vehicles, and records Appellant's speed as exceeding 95 miles per hour when he passes in front of New Braunfels High School (VIII R.R. State's Ex. 1 at 2:09-3:35). Once Appellant exits at Walnut, State's Exhibit 1 shows him passing vehicle parked at the red light by driving onto the grassy median at a high rate of speed (*Id.* at 3:35-3:51).

Thereafter, Appellant passes Casa Garcia, where he had agreed to take Ms. Sanchez, pulls back on to Loop 46, and continues around Loop 46 until he reached Interstate 35 (III RR. at 17-18, 21, and 76). State's Exhibit 1 clearly shows Appellant pulling back onto Loop 46, accelerating to speeds in excess of 106 miles per hour, passing vehicles using both the center turn lane and the right shoulder, and speeding through a red light at an extremely crowded intersection, all before reaching the on ramp to Interstate 35 (VIII RR. States Ex. 1 at 3:51 – 5:56). Throughout the chase, Ms. Sanchez is seen clinging tightly to Appellant (*id.*). As

14

Appellant approaches another busy intersection on Loop 46, Ms. Sanchez drops a box of tampons out of her purse (*id.* at 4:47).

State's Exhibit 1 also shows Appellant reach Interstate 35 and turn off onto the frontage road alongside Interstate 35, at which point Appellant nearly loses control of the motorcycle while traveling at a high rate of speed with Ms. Sanchez on the back (*id.* at 5:56-6:06). As State's Exhibit 1 continues, Appellant races down the Interstate 35 frontage road travelling over 92 miles per hour, passes the first on ramp to Interstate 35, runs a red light at an intersection on the Interstate 35 frontage road by passing between two vehicles stopped at the light, and then cuts off a cement truck at the second on ramp to Interstate 35 in a clear effort to lose Officer Kempker (*id.* at 6:06-7:06). Appellant is then recorded continuing down Interstate 35, weaving in and out of traffic, at speeds exceeding 116 miles per hour until the chase is called off (*id.* at 7:06-9:52).

The video entered into evidence as State's Exhibit 1 includes the entirety of the high speed chase between law enforcement and Appellant on October 1, 2013. A review of State's Exhibit 1 reveals that Appellant operated a motorcycle with Alicia Sanchez riding as a back seat passenger. Throughout the chase depicted in State's Exhibit 1, Appellant is recorded operating that motorcycle in a manner clearly capable of causing death or serious bodily injury to his passenger, other motorist, the officers engaged in pursuit, and even himself. At no point during the

entirety of the chase does Appellant slow down to a speed that would allow Ms. Sanchez to safely depart from the motorcycle. By Appellant's actions recorded and admitted on State's Exhibit 1, he forces Ms. Sanchez to choose between either holding on and accompanying Appellant as he evades officers or release her grasp and fall to certain injury or death.

## The Testimony of Alicia Sanchez

Ms. Alicia Dawn Sanchez was called to testify during the State's case in chief (III R.R. at 70). On direct examination, Ms. Sanchez testified that she was supposed to start a new job at Casa Garcia on the morning of October 1, 2013 (*id.* at 73). She further testified that Appellant had agreed to take her to work that morning and that he picked her up to go to Casa Garcia on a motorcycle (*id.* at 73-74). When the police officer attempted to pull them over, Ms. Sanchez she told Appellant an officer was pulling them over and Appellant agreed to pull over at an upcoming gas station (*id.* at 74-75). However before reaching the gas station, Ms. Sanchez heard Appellant say "Fuck it" and "I'm running" (*id.* at 75-76). Thereafter, Ms. Sanchez stated that Appellant "took off" around the loop, past Casa Garcia, and onto I-35 (*id.* at 76). Appellant never pulled over for the police and only stopped once he reached the Caterpillar store in Schertz (*id.* at 77). Once he pulled over at the Caterpillar store, Ms. Sanchez hopped off of the motorcycle, ran

behind a piece of machinery, and then ran into the bathroom of the store (*id.*). During the course of direct examination, Ms. Sanchez testified that during the motorcycle ride, she did not want to be on the highway going 100 miles per hour, she did not want to be involved in a police chase, she asked Appellant to stop, she asked Appellant to let her off of the motorcycle, Appellant did not stop until after the police chase had ended, and she was not free to leave until after the police chase ended (*id.* at 76-78).

On cross examination by defense council, Ms. Sanchez stated that she did not feel like she was forced to be on the motorcycle and that she knew Appellant would let her go eventually (*id.* at 82-83). In that same accord, she testified that she considered Appellant to be family, that Appellant was the only one in the world who was there for her and her family, and that she did not want to see anything bad happen to Appellant (*id.* at 91-92). During redirect, she ultimately admitted that she told Appellant "Stop. Stop. Let me off." and "Let me off. I'm scarred." (*id.* at 90-91). However, Appellant did not stop when she wanted him to and she was very scared by the way he was driving. (*id.*).

## State's Exhibit 7 – Video Taped Statement of Alicia Sanchez

The videotaped statement given by Alicia Sanchez to Detective Jace Hobbs on October 1, 2013, shortly after she was found at the Caterpillar store was admitted into evidence as State's Exhibit 7 (*id.* at 99). During the course of her interview, Detective Hobbs observed Ms. Sanchez to be very distraught, scared, amped up, and crying (*id.* at 97). As soon as Ms. Sanchez appears on State's Exhibit 7, she is seen shaking, sniffling, distraught, and crying (VIII R.R. State's Ex. 7). In that interview, Ms Sanchez stated:

- that Appellant was giving her a ride to work (8:30),
- that she had told Appellant there was a police behind them (9:18),
- that Appellant agreed to pull over at the upcoming gas station (9:18),
- that Appellant began to slow down and pull over (9:50),
- that Appellant said "Fuck it. I'm running" (9:50),
- that she told Appellant she was scarred (10:24),
- that she told Appellant to stop (10:24),
- that she told Appellant she wanted off of the motorcycle (10:24),
- that Appellant drove into oncoming traffic and passed vehicles on the shoulder (11:38),
- that she thought they were going to have an accident and that they would have died in an accident (28:45),
- that she pleaded with Appellant to let her off of the motorcycle (11:38), and
- that when Appellant slowed down in front of the Caterpillar store, she jumped off and ran inside because she was scared and just wanted to go home (12:42).

(VIII R.R. State's Ex. 7).Ms. Sanchez shakes, cries, and wipes tears from her eyes throughout her entire interview with Detective Hobbs (VIII R.R. State's Ex. 7).

18

**State's Exhibit 8 –Videotaped Statement of Appellant**

State's Exhibit 8, as admitted at trial, was redacted to contain four clips from the videotaped statement given by Appellant to Detective Bell (III R.R. at 113-115). During the course of that interview, Appellant confirmed that he was the driver of the motorcycle, that he had seen the officers behind him that morning, that he had a passenger on the back of the motorcycle, and that he ran because he knew that he was going to jail any way and he intended to make the police officers earn their money rather than surrender peacefully (VIII R.R. State's Ex. 8). Also during the course of this statement, Appellant seemed to concede that there was a substantial risk not only to his life but also to the life of his passenger (*id.*). However, Appellant claimed that Ms. Sanchez had told him to run from the police and in doing so, she chose to risk his life and her own life (*id.*).

**State's Exhibits 9 and 10 – Recorded Jail Visits**

Contained on State's Exhibit 9 were two clips from a recording of a jail visit that Appellant had with friends on November 5, 2013 (VIII R.R. State's Ex. 9). Contained on State's Exhibit 10 was a single clip from a recording of a jail visit that Appellant had with friends on November 26, 2013 (VIII R.R. State's Ex. 10). On the first clip contained on State's Exhibit 9, Appellant can be heard telling his

friends that he had gotten away from the police by going 120 miles per hour on his motorcycle and that Dawn had managed to get away from the police (VIII R.R. State's Ex. 9). On the second clip contained on State's Exhibit 9, Appellant tells his friends that:

> "***She (Dawn) was scared man. She was beating me in the ribs, wanting off. She was screaming. Stop. Help. I said I ain't stopping till I loose these motherfuckers.***"

(VIII R.R. State's Ex. 9, file two, 0:07) (emphasis added). It should be noted that Ms. Sanchez's full name was Alicia Dawn Sanchez and that Appellant referred to her as "Dawn" in his testimony at trial (IV R.R. at 16). On State's Exhibit 10, Appellant is recorded telling his friends that he had a gun on him whenever these events occurred and that he tried to hide it in the bushes, but the officers were able to find it (VIII RR. States Ex. 10).


**Testimony of Appellant**

During cross, Appellant admitted that at some point Ms. Sanchez had told him to stop (*id.* at 28). Appellant also admitted that he was convicted for the offenses of violation of a protective order and unlawful carrying of a handgun by a licensed holder for the carrying handgun that was found in his possession of the offense date (*id.* at 45 and 68).

20

## Argument and Authority

### Elements of Aggravated Kidnapping

The elements of aggravated kidnapping as charged in this case are that the defendant intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense. Tex. Pen. Code Ann. §20.04(b) (West, Westlaw through 2013 Sess.). Under the Penal Code, "Abduct" means to restrain a person with intent to prevent his liberation by: secreting or holding him in a place where he is not likely to be found; **or** using or threatening to use deadly force. Tex. Pen. Code. Ann. §20.01(2) (West, Westlaw through 2013 Sess.) (emphasis added). Under the Penal Code, "Restrain" means to restrict a person's movements without consent so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. Tex. Pen. Code. Ann. §20.01(1) (West, Westlaw through 2013 Sess.). Appellant does not seem to challenge that a deadly weapon was used in the commission of the offense

### Intent to Commit Kidnapping

There is no bar to prosecution that occurs if the kidnapping is part and parcel of another offense, and conduct that occurs during the commission of another offense can be prosecuted as a kidnapping. *Hines v. State*, 75 S.W.3d 444, 447 (Tex. Crim. App. 2002). Whether a defendant intends to commit kidnapping or

another offense is irrelevant. *Gonzales v. State*, 190 S.W.3d 125, 132 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd). The relevant issue is a defendant's intent to commit the elements of a crime, not the defendant's intent to commit a particular named offense. *Id.* As applied to kidnapping, whether a Defendant moved his victim with the intent to commit some other offense is irrelevant where the byproduct of the main goal resulted in the meeting of the elements of the crime of kidnapping. *Santellan v. State*, 939 S.W.2d 155, 162 (Tex. Crim. App. 1997).

As applied in the case at bar, it is irrelevant whether Appellant intended to commit the offense of evading arrest with a motor vehicle or the offense of kidnapping. The only relevant issue is whether Appellant's conduct resulted in meeting of all of the elements of aggravated kidnapping. The *Hines* case established this particular concept of kidnapping law by determining that, while engaged in the act of robbery, the defendant had also committed the offense of aggravated kidnapping when he substantially interfered with the victim's liberty. *Hines,* 75 S.W.3d at 445-448. This same principle of kidnapping law has been applied in cases where the defendant manifests an intent not to kidnap, but to flee apprehension or discovery by law enforcement. *Mayer v. State.* 274 S.W.3d 898, 900 (Tex.App.-Amarillo 2008, pet. ref'd)(Holding that by taking a passenger with him in an effort to avoid capture for assault the defendant had committed the offense of kidnapping). The court determined that even if such was Appellant's

22

intent, fleeing with such an intent would negate the element of abduction established by the evidence for the charge of aggravated kidnapping. *Id.* at 901. In the instant case, even if Appellant's intent was simply to evade arrest, he can still be held responsible for aggravated kidnapping where his conduct meets the relevant elements of the offense.

**Restraint**

Restraint requires a restriction of a person's movements without their consent, which interferes substantially with the person's liberty, by moving the person from one place to another or by confining the person. Tex. Pen. Code. Ann. §20.01(1) (West, Westlaw through 2013 Sess.). Under Texas law, there is no requirement that a defendant moved his victim a certain distance or held his victim any specific length of time. *Hines,* 75 S.W.3d at 447. The jury is called upon to make the factual determination of whether the restriction of the person's movements constitutes a substantial or a slight interference. *Id.* at 448. In the case at bar, Appellant is clearly seen in State's Exhibit 1 moving Ms. Sanchez from one place to another (VIII R.R. State's Ex. 1). Appellant does so by accelerating the motorcycle that she is riding on to an extremely high speed while weaving in and out of traffic, running multiple red lights, and evading arrest or detention by law enforcement (*id.*). As Appellant engaged in that manner of operation of the motorcycle, Ms. Sanchez held tight to his waist (*id.*). At no point during the pursuit

23

did Appellant slow enough to allow his passenger an opportunity to safely disembark the vehicle (*id.*). Based on that depiction in State's Exhibit 1, a rational jury could certainly determine that Ms. Sanchez's movements were restricted in that the only safe course of movement was to hold tightly to Appellant and remain on the motorcycle. Likewise, that same jury could certainly determine that the interference with Ms. Sanchez's liberty was substantial. The only matter left for consideration on the issue of restraint is whether such restraint was accomplished without Ms. Sanchez's consent.

Since absence of consent is an element, whether or not Appellant restrained Ms. Sanchez without her consent is a factual question for the jury to determine. As a preliminary consideration, the fact that a victim initially accompanies a Defendant voluntarily does not preclude the possibility of a kidnapping occurring at some subsequent point. *Rodriguez v. State*. 730 S.W.2d 75, 79 (Tex.App.-Corpus Christi, 1987, no pet.). A good illustration of this principle is seen in the *Rodriguez* case. In *Rodriguez*, the defendant and his brother offered to give the victim and several of her family and friends a ride home from a night club. *Id.* at 78. The victim rode up front between the defendant and his brother while the victim's family and friends sat in the bed of the truck. *Id.* During the trip home, the victim gave the defendant turn-by-turn directions. *Id.* At some point the victim told defendant to turn on a particular street. *Id.* The defendant refused. *Id.* The victim

24

then directed the defendant to turn on the next street. *Id.* The defendant refused and sped up. *Id.* Thereafter, a fight ensued between the defendant and his brother and the victim's family and friends. *Id.* Ultimately the victim's family and friends were thrown from the bed of the truck and the defendant continued driving off with the victim. *Id.* Both defendant and the defendant's brother assaulted the victim and both told her that they were going to kill her with a gun that was under the seat. *Id.* The court in *Rodriguez* determined that the fact that the victim was initially a willing passenger did not preclude the occurrence of a subsequent kidnapping. *Id.* at 79. What is really interesting about the *Rodriguez* opinion is the point at which the court determined that a kidnapping occurred. *Id.* The court held in *Rodriguez* that:

> The kidnapping began when the victim demanded to be taken to her home and appellant refused. Her presence, positioned between the two abductors, in the cab of the fast-moving truck then became confinement, and a substantial interference with her liberty.

*Id.* at 79. Although the Defendant in *Rodriguez* assaulted the victim and threatened to kill the victim with a handgun that he claimed was in the vehicle, the court found that the kidnapping happing began prior to either the assault or the threatened deadly force. *Id.* The court held that the kidnapping actually began at the point where the victim asked to be taken home, the defendant refused, and the defendant sped up. *Id.* The case at bar is similar. The record is replete with

25

evidence that Ms. Sanchez told Appellant to stop, to pull over, and to let her off. When Ms. Sanchez asked Appellant to do so, Appellant refused and accelerated. Ms. Sanchez's vulnerable position on the back of Appellant's motorcycle became confinement and a substantial interference with Ms. Sanchez's liberty.

Furthermore, the definition of restraint set out in the statute explicitly states that restraint is without effective consent if it is accomplished by force, intimidation, or deception. Tex. Pen. Code. Ann. §20.01(1) (West, Westlaw through 2013 Sess.). There is no need that the force be directed at the victim as Appellant asserts in his brief. A threat may be communicated by acts, words, or deeds. *Gaffney v. State.* 937 S.W.2d 540, 542 (Tex.App.-Texarkana, 1996, no pet.). In the instant case, Appellant's actions threatened Ms. Sanchez life and safety. By refusing to stop as requested, accelerating the motorcycle, and driving in the reckless manner that he did, Appellant forced Ms. Sanchez to hold tightly to him and accompany him as he sought to evade capture. His actions forced her to choose between going with Appellant or dying in an effort to secure liberation. Furthermore, Appellant's actions were inherently intimidating. Detective Hobbs testified about Ms. Sanchez's distraught mental state and State's Exhibit 7 clearly depicts a terrified victim. The fear brought to bear on Ms. Sanchez by Appellant's actions could easily and rationally be construed to have intimidated her into acquiescence rather than attempting to jump off the speeding vehicle.

Finally, restraint should be considered without consent when Appellant exceeds the scope of defined consent or whenever the victim actually revokes her consent. In *Gonzales v. State*, the victim explicitly asked her kidnapper multiple times to let her go. 190 S.W.3d 125, 133 (Tex. App.—Houston [1ˢᵗ Dist.] 2005, pet. ref'd). Not surprisingly, the court in *Gonzales* found that where the victim repeatedly asked to be let go, the restraint was without consent. *Id.* First, Ms. Sanchez voluntarily rode with Appellant for the express purpose of being transported to her place of employment at Casa Garcia. Whenever Appellant accelerated past Casa Garcia, he exceeded the limitations of Ms. Sanchez's consent. Second, regardless of their prior arrangements, the record contains ample evidence that Ms. Sanchez told Appellant to stop and let her off the motorcycle. Ms. Sanchez testified to the jury that she told Appellant to stop and let her off, State's Exhibit 7 contained a recording of Ms. Sanchez stating multiple times that she told Appellant to stop and let her off, file two of State's Exhibit 9 contains a recording of Appellant telling people that Ms. Sanchez was hitting him in the ribs and crying out 'stop, let me off,' and finally Appellant in his testimony admitted that at least at some point he heard Ms. Sanchez ask him to stop and let her off.

The evidence, when viewed in the light most favorable to the jury's verdict, clearly demonstrates that a rational jury could have found that Appellant restrained Ms. Sanchez. Evidence exists in the record from which a rational jury could

determine that Appellant restricted Ms. Sanchez's movements, that said restriction was without Ms. Sanchez's consent, that said restriction was a substantial interference with Ms. Sanchez's liberty, and Appellant restricted her movements by either moving her from place to place or confined her.

**Abduction**

The offense of kidnapping is complete whenever restraint has been established and there is evidence of the actor's specific intent to prevent liberation. *Brimage v. State*, 918 S.W.2d 466, 475-76 (Tex. Crim. App. 1994), *on reh'g* (Jan. 10, 1996). The element of abduction that requires an intent to prevent liberation is part of the mens rea of kidnapping, not the actus reus. *Id.* As such, it does not matter whether Appellant actually succeeded in preventing liberation by secreting the victim in a place where she was not likely to be found or by the use or threatened use of deadly force. The key is whether Appellant intended to prevent the victim's liberation by secreting her in a place where she was not likely to be found or by the use or threatened us of deadly force.

When evaluating whether Appellant intended to prevent the liberation of this victim by secreting her in a place where she was not likely to be found, our case law has consistently held that the fact that a defendant is operating a motor vehicle in a public place does not negate the intent to secrete or keep the victim from being found. *Megas v. State,* 68 S.W.3d 234, 240 (Tex.App.-Houston [1st Dist.] 2002,

28

pet. ref'd).  An excellent example of this concept is seen in the *Mayer* case. 274

S.W.3d 898. In the *Mayer* case, the defendant confronted his victim in the parking

lot of a convenience store, assaulted her, and forced her to leave with him in her

vehicle. *Id.* at 900-901.  At trial, the defendant admitted to his conduct but claimed

his intention was to flee the scene of the assault, not to kidnap his victim. *Id.* at

900.  In analyzing this claim, the court held that:

> Even by appellant's own argument that he sought to flee from the store to avoid capture, he was doing so by attempting to reach a location where he could not be found.  However, in his attempt to avoid capture, all the evidence at trial showed that appellant forced Tammy to go with him.  Therefore by seeking a location where he could not be found and by forcing Tammy to go with him, he was taking Tammy to a location where it was likely that she would not be found.

*Id*. at 901. Obviously, the facts of *Mayer* have a significant parallel to the facts in

the case at bar regarding Appellant's intent to prevent the liberation of his victim

by secreting her away.  It is clear from the record that Appellant intended to reach a

place where he could not be found so as to evade capture.  In doing so, he took a

terrified Ms. Sanchez along for the ride.  Although our law requires a specific

intent to prevent Ms. Sanchez's liberation, *Mayer* tells us that that specific intent is

shown when Appellant, seeking a place where law enforcement will not find him,

takes his victim with him in that search for a place to evade capture.

Appellant attempts to distinguish *Mayer* from the case at bar by arguing that *Mayer* is inapplicable because the defendant in *Mayer* used force directed at his victim. This argument confuses the distinction between actus reus of kidnapping and the mens rea of kidnapping. The holding in *Mayer* is that the specific intent to secret is satisfied if the defendant takes his victim with him in seeking a place to hide from law enforcement. In that scenario the discussion of whether force was directed towards the victim would factor into the consent analysis of restriction and be part of the actus rea. As such, the fact that *Mayer* used force against his victim to restrict her movements has no bearing on whether his actions indicated the specific intent to secret his victim. The same applies in our case. Even if Appellant was correct in arguing that no force was directed at Ms. Sanchez, that would not negate the Appellant's mens rea in taking Ms. Sanchez along in his effort to reach a place where the police could not find him.

Specific intent to prevent liberation can also be established by the use or threatened use of deadly force against a victim. The fact that Appellant utilized his motorcycle in a manner that was capable of causing death or serious bodily injury is essentially undisputed. Not only did Detective Bell indicate that the motorcycle was used in a manner capable of causing death or serious bodily injury to Appellant, his passenger, and the multitude of other drivers on the road, both Ms. Sanchez and Appellant made similar statements in State's Exhibit 7 and State's

Exhibit 8 (VIII R.R. State's Ex. 7 and VIII R.R. State's Ex. 8). Beyond that, any juror could appreciate the danger of Appellant's actions simply from watching State's Exhibit 1. By using the motorcycle in that way, Appellant used deadly force or threatened deadly force in an attempt to prevent his capture and the liberation of Ms. Sanchez.

Appellant argues that the trial testimony of Ms. Sanchez is sufficient in and of itself to negate abduction because she stated that she knew Appellant did not intend to prevent her liberation (Appellant's Brief at 10). This argument is ill conceived because it ignores both the interview admitted as State's Exhibit 7 and the portions of Ms. Sanchez's trial testimony that contradict the Appellant's position. The record demonstrates contrary evidence from many different sources, including the rest of Ms. Sanchez's testimony and her recorded statement. Furthermore, this argument ignores the proper standard of review and seeks to completely obliterate the jury's role as the sole judge of the credibility of the witnesses. A somewhat similar situation was seen in *Charles v. State*. 05-10-01520-CR, 2012 WL 2335323, at *1 (Tex. App.—Dallas June 20, 2012, pet. ref'd) (not designated for publication).

In *Charles*, evidence presented from multiple eyewitnesses established that the defendant drove to his ex-girlfriend's house, shot up and kicked in the back door, punched the victim, dragged the victim, and forced both the victim and her

31

young daughter in his car. *Id.* However, when officers finally located the victim, she told the officers that it was a crime of passion and nothing important. *Id.* Whenever the case came to trial, the victim testified she and the defendant were in a dating relationship, she seeing her ex-boyfriend, she never heard any gunshots, and that she never saw a gun. *Id.* The victim did concede that the defendant had punched her and might have pulled her hair, but stated that she and her daughter both went with the defendant voluntarily and could have left at any time. *Id.* Although the Defense argued that, based on the victims testimony, there was no credible evidence that a kidnapping occurred, the jury disagreed and convicted the defendant of aggravated kidnapping. *Id.* The court in *Charles* reiterated that the jury is the sole judge of credibility and that the jury was free to disbelieve the victim's testimony. *Id.* The same principal certainly applies here. The jury was free to discredit those portions of Ms. Sanchez's testimony that were favorable to Appellant. The jury may even have been inclined to do so because both Ms. Sanchez and Appellant testified that they saw one another as family.

## Deadly Weapon and Other Elements

Appellant does not seem to contest any of the other elements of aggravated kidnapping. Officer Kempker, Detective Bell, and Officer Rapier all testified that these events occurred within Comal County on October 1, 2013. Detective Bell,

Ms. Sanchez, Officer Rapier, Officer Adams, and Appellant himself confirmed his identity as the same individual driving the motorcycle and transporting Ms. Sanchez. Detective Bell testified that the manner and means in which Appellant operated the motorcycle was capable of causing death or serious bodily injury, and the video introduced as State's Exhibit 1 certainly demonstrates that Appellant used the motorcycle as a deadly weapon (III R.R. at 126-127).

## Conclusion

The evidence within the record addresses every element of aggravated kidnapping. The courts must defer to the jury's determination of facts where there was evidence on which a rational jury could have based their decision. Evidence was submitted as to each and every essential element of the offense of aggravated kidnapping. The jury acted the sole judge of credibility and weighed the evidence in determining that Appellant was guilty of the offense of aggravated kidnapping. The evidence was legally sufficient to support Appellant's conviction for aggravated kidnapping.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests this Court to deny Appellant's single point of error and affirm Appellant's conviction for the offense of aggravated kidnapping as alleged in the indictment.

33

Respectfully Submitted,


<u>/s/ Clayten Hearrell</u>
**Clayten Hearrell**
Assistant Criminal District Attorney
SBN: 24059919
150 N. Seguin Ave., Suite 307
New Braunfels, Texas 78130
Phone: (830) 221-1300
Fax: (830) 608-2008
hearrc@co.comal.tx.us

ATTORNEY FOR THE STATE


## <u>CERTIFICATE OF SERVICE</u>

I, Clayten Hearrell, attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this brief has been delivered to the attorney of record for the opposing party:

Mr. John G. Jasuta
lawyer1@johnjasuta.com
1801 East 51st Street
Austin, TX 78723

By electronically sending it to the above-listed email address through efile.txcourts.gov e-filing, this 6th day of November, 2015.

<u>/s/ Clayten Hearrell</u>
**Clayten Hearrell**

34

## CERTIFICATE OF COMPLIANCE

I, Clayten Hearrell, hereby certify that this document was prepared in MS Word and it does not exceed the allowable length for an appellate brief, pursuant to Tex. R. App. Pro. 9.4, as amended and adopted on November 30, 2012, by Order of the Texas Court of Criminal Appeals.  The approximate total of words in this document, as calculated by the word processing software, is 8,132 words.

<u>/s/ Clayten Hearrell</u>
**Clayten Hearrell**